IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Lewis T. Babcock, Chief Judge

Civil Case No. 04-cv-00931-LTB-MJW

ERNEST STANTON,

    Plaintiff,

v.

YANCEY'S FOOD SERVICE CORPORATION,

    Defendant.

_____

ORDER
_____

The defendant, Yancey's Food Service Corporation ("Yancey's"), moves for summary judgment on the claims of the plaintiff, Ernest Stanton, who alleges that Yancey's violated the Family Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.* ("FMLA"), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), and retaliated against him. The motion is adequately briefed and oral argument would not materially aid its resolution. For the reasons stated below, I GRANT the motion.

**I. Facts**

The material facts are undisputed, except where noted. Mr. Stanton, an African-American, began his employment with Yancey's, a food distributer, on January 26, 2001. Over the ensuing months, Mr. Stanton succumbed to a few peccadillos, none warranting termination, while performing his duties as a forklift operator. His employment record includes citations for restroom breaks of excessive length, damage to equipment, and an incident of insubordination.

Yancey's promulgates an attendance policy, which Mr. Stanton acknowledges having received and reviewed, requiring its employees to notify their managers of any foreseen absence or tardiness before the commencement of an imminent shift. Yancey's makes available to employees a telephone line devoted to the purpose, which an employee anticipating absence or tardiness must call, unless unable, in which case some person must call for him. Failure to abide by this policy is labeled a "No Call/No Show." This offense is distinct from an "Attendance Violation," which consists of absence or tardiness and can be either excused or unexcused.

The sanctions for a No Call/No Show infringement are explicit. The policy provides,

> It is of utmost importance that an employee call to inform Yancey's of an impending absence before the start of the shift in question. This is not only a matter of courtesy, but it is essential for the proper functioning of our business. All employees are given Yancey's twenty-four hour employee phone number so that they can reach us at any time of the day. If an employee does not call prior to the start of their shift to inform their manager (or supervisor if no manager is present) of an impending absence, the following disciplinary steps will be taken:
> - The first no call/no show violation will result in a written warning being given to the employee by a manager or supervisor.
> - The second no call/no show violation will result in suspension (unpaid) or termination of employment.

Different consequences attend violations of other attendance requirements – early departure, unexcused attendance violations.

On the evening of May 10, 2001, Mr. Stanton failed to appear for his scheduled shift and failed to call the designated telephone line to report his absence. A written warning issued. Mr. Stanton again failed to appear, without notice, the next evening, May 11. Yancey's terminated his employment. The night manager's written report explained, "Ernest did not call in or show up for his shift this evening. This is his second No call/No show since hire and as of 5/11/01 his position is terminated." Mr. Stanton later contacted his supervisor, explaining that he had overdosed on

2

narcotics and been hospitalized. Yancey's then rescinded the termination, forgave the May 10, 2001 incident, and on May 21, 2001 issued a written warning for the May 11, 2001 incident. Mr. Stanton, upon receiving this warning, learned "a very valuable lesson about the company's call-in policy; and that was to call in as soon as practical (sic) or to notify them in advance, if you knew in advance, that you needed to be off."

On February 6, 2002, Stephen Brindley, a co-worker, demanded that Mr. Stanton move his forklift, adding, "Your kind is not wanted in my territory." Mr. Stanton, taking the reference to his "kind" as a racial allusion, reported the incident to Bob Rutherford, a manager. Mr. Rutherford assured Mr. Stanton that he would "take care of it." Mr. Brindley delivered further comments, which Mr. Stanton felt were threatening, throughout the shift. Before leaving at the end of the shift, Mr. Stanton again complained to Mr. Rutherford, who again promised to remedy the situation. Mr. Rutherford then reprimanded Mr. Brindley and issued a written warning.

The next day, Mr. Brindley approached Mr. Stanton and pledged to kick Mr. Stanton's "black ass" for reporting the previous evening's events to Mr. Rutherford. Mr. Stanton reported this encounter to Mr. Rutherford and asked permission to leave work, which Mr. Rutherford granted. The next time Mr. Stanton reported for work, Mr. Rutherford coerced Mr. Brindley to apologize to Mr. Stanton. That, to Mr. Stanton's recollection, put an end to Mr. Brindley's harassment.

Mr. Stanton in deposition recalled other racially-tinged remarks, which he had endured during his employment at Yancey's. A man named John, who "worked in the freezer," daily referred to Mr. Stanton as "colored man." Similarly puerile remarks, which Mr. Stanton cannot now recall, emanated from other Yancey's employees, whom Mr. Stanton cannot now name. A

freezer worker named Sean once informed Mr. Stanton that acquaintances of his – "KKK brothers" – could "deal with" Mr. Stanton. Mr. Stanton informed Mr. Rutherford of this comment. Mr. Rutherford, according to Mr. Stanton's recollection, opined that Mr. Stanton was "old enough to deal with it."

On March 17, 2002, Mr. Stanton called Yancey's and reported that he was ill and would miss work. On March 18, 2002, Mr. Stanton again missed work, but did not call Yancey's to report his absence. His absence continued until March 24, 2002, whereupon he informed Yancey's that he had during the intervening period submitted to treatment for a heroin addiction. Yancey's excused the absence as leave pursuant to the FMLA.

On May 9, 2002, Mr. Stanton was scheduled to begin work at 7:00 P.M.. He did not arrive. Some time after 10:00 P.M., a nurse called Yancey's employee telephone line to report that Mr. Stanton would not be working that evening; he was experiencing pain in a tooth and had driven himself to an emergency room at approximately 10 o'clock. Mr. Stanton did not account for his failure to call during the first three hours of his shift. He received a shot, was issued a prescription, and left the hospital shortly after midnight. Mr. Stanton, who understood the nurse to have informed Yancey's that he would be absent for two days, also missed work on May 10, 2002 and did not call the employee line. Yancey's terminated Mr. Stanton's employment on May 12, 2002 for multiple violations of the no call/no show policy.

## II. Discussion

The purpose of a summary judgment motion is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). I shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no

genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The non-moving party has the burden of showing that there are issues of material fact to be determined.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any, which it believes demonstrate the absence of genuine issues for trial.  *Id.* at 323; *Mares v. ConAgra Poultry Co.*, 971 F.2d 492, 494 (10th Cir. 1992).  Once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.  *Otteson v. United States*, 622 F.2d 516, 519 (10th Cir. 1980); Fed. R. Civ. P. 56(e).  These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the pleadings themselves."  *Celotex* at 324.

### A.    Retaliation claim

Yancey's correctly points out that Mr. Stanton's complaint to the Equal Employment Opportunity Commission makes no mention of a claim for retaliation and contains no factual allegations that might be read as constituting such a claim.  Mr. Stanton marked boxes on the complaint form for race and age discrimination and left the box designating a retaliation claim blank.  *See Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1260 (10th Cir. 1998).  For

those reasons, Mr. Stanton has not exhausted his administrative remedies, and his claim for retaliation must be dismissed. *Belcher v. Boeing Commercial Airplane Group*, 105 Fed. Appx. 222, 227 (10th Cir. 2004).

### B.     FMLA claim

Mr. Stanton argues that Yancey's interfered with his rights under the FMLA. He asserts that his absence in March, 2002 was excusable under the FMLA, which Yancey's concedes, and that he was similarly immune from consequences for his absence in May, 2002, which Yancey's disputes. Yancey's points out that Mr. Stanton's assertion of FMLA protection for his May, 2002 absence is a new theory, asserted for the first time in response to Yancey's motion for summary judgment and that Mr. Stanton did not in his Rule 26 disclosures identify any of the entities that provided health care to him during that period.

I need not resolve the legal question whether Mr. Stanton's two-day absence in May, 2002 qualified him for FMLA protection. Yancey's did not fire Mr. Stanton for being absent on May 9 and 10, 2002 but rather for failing to call the employee line before his shifts commenced on those dates, and for his prior offense on May 11, 2001. In Yancey's policy, the no call/no show offense is distinct from the unexcused absence offense and invites more stringent penalties. Mr. Stanton has demonstrated no causal connection between his March, 2002 absence and his termination. Even assuming that his absence on May 9 and 10, 2002 was protected under the FMLA, it is undisputed that Yancey's fired him for an unrelated reason. *Bones v. Honeywell Intern'l, Inc.*, 366 F.3d 869, 877-878 (10th Cir. 2004).

### C.     Hostile work environment

Finally, Mr. Stanton argues that Yancey's tolerated a work environment hostile to

6

African-Americans in violation of Title VII. He must "demonstrate that a rational jury could conclude 'that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Jones v. Barnhart*, 349 F.3d 1260, 1268 (10th Cir. 2003) (*quoting  O'Shea v. Yellow Technology Services, Inc.*, 185 F.3d 1093, 1097 (10th Cir. 1999)). This requires Mr. Stanton to assert more than a few isolated incidents of racial enmity. *Id.* The abusiveness of the working environment is judged according to both subjective and objective standards, meaning "the conduct must be 'severe or pervasive enough to create... an environment that a reasonable person would find hostile or abusive,' and the victim must 'subjectively perceive that environment to be abusive." *Harrison v. Eddy Potash, Inc.*, 248 F.3d 1014, 1023 (10th Cir. 2001), *cert. denied*, 534 U.S. 1019, 122 S. Ct. 543, 151 L. Ed. 2d 421 (2001) (*quoting Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)). In evaluating Mr. Stanton's claim on summary judgment, I must examine all of the circumstances alleged including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Jones*, 349 F.3d at 1268.

Mr. Brindley's behavior gives rise to no claim under Title VII because Yancey's took immediate remedial action. Indeed, Mr. Brindley's reference to Mr. Stanton's black posterior grew out of Mr. Rutherford's reprobation of Mr. Brindley's first remark. Mr. Rutherford made Mr. Brindley apologize to Mr. Stanton for the statements and issued to Mr. Brindley a written warning. Mr. Brindley thereafter stopped molesting Mr. Stanton. As a matter of law, Yancey's responded reasonably to Mr. Brindley's mischief. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664,

676 (10th Cir 1998).

Mr. Stanton asserts that he informed management of the other racially-charged comments that were leveled against him. Yancey's disputes this assertion and points out that, when made aware of Mr. Brindley's conduct, it responded appropriately. Any factual dispute is immaterial because an abusive work environment, if one existed, did not alter the conditions of Mr. Stanton's employment.

Assuming, as I must, that Mr. Stanton complained of the comments by the freezer men, Sean and John, it is apparent that he found the remarks subjectively abusive. However, viewing the totality of the circumstances objectively, the evidence does not give rise to an inference of a hostile work environment sufficiently pervasive to interfere with Mr. Stanton's work performance. Sean's comment, though threatening (indeed, disturbing), occurred once and did not impel Mr. Stanton to change his behavior, as Mr. Brindley's comment did. Mr. Stanton testified that he worked with Sean during his entire tenure at Yancey's and that Sean never indulged in such conduct before or after this isolated incident. John's continual reference to Mr. Stanton as a colored man, though offensive, did not interfere with Mr. Stanton's work. John directed no threatening comments toward Mr. Stanton and uttered no other epithets.

In light of Mr. Rutherford's prompt and appropriate response to Mr. Brindley's confrontation with Mr. Stanton, these isolated incidents of racial enmity do not create an issue for the jury. *Jones*, 349 F.3d at 1269; *MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1281 (10th Cir. 2005). Viewed in totality, the incidents that interfered with Mr. Stanton's work prompted a reasonable and effective response from Yancey's, while other incidents of racial enmity did nothing to alter the conditions of Mr. Stanton's employment.

Finally, Mr. Stanton speculates that he was treated more severely than white employees. However, he has provided no evidence and recalls no facts suggesting that Yancey's accorded greater leniency to white employees who violated the no call/no show policy or that he received written or oral warnings with greater frequency than similarly-situated non-blacks.

Accordingly, it is ORDERED that:

1) Yancey's' motion for summary judgment (Doc 57) is GRANTED; and

2) judgment shall enter for Yancey's as a matter of law, with costs.

Dated: June __13__, 2006, in Denver, Colorado.

BY THE COURT:

s/Lewis T. Babcock
Lewis T. Babcock, Chief Judge